# THE CONSOLIDATED COAL COMPANY OF ST. LOUIS

*v.*

# BENTON GRUBER.

*Opinion filed December 20, 1900—Rehearing denied February 8, 1901.*

1. COSTS—*right of an infant plaintiff to prosecute as a poor person.* Upon motion to dismiss a suit for personal injuries to an infant upon the ground that no bond for costs had been filed, the court may allow a cross-motion for leave to prosecute as a poor person, upon satisfactory proof that both the infant and his next friend are insolvent. (*Chicago and Iowa Railroad Co.* v. *Lane,* 130 Ill. 116, followed; *Illinois Central Railroad Co.* v. *Latimer,* 128 id. 163, explained.)

2. FELLOW-SERVANT—*what does not render mine manager a fellow-servant of miner.* An assistant mine manager who temporarily takes charge of and runs a machine for undercutting coal, for the purpose of ascertaining its defect so he may repair it, as part of his duties as assistant manager, does not, as matter of law, thereby become the fellow-servant of the shoveler who follows the machine.

3. MASTER AND SERVANT—*when employer's rule making danger from falling coal a usual risk does not apply.* A rule adopted and posted by a mining company that the danger of injury from falling coal is one of the usual risks of the service and employees must govern themselves accordingly, does not apply to a case where a miner is injured by a fall of coal occasioned by the negligence of one acting in his capacity as vice-principal.

*Consolidated Coal Co.* v. *Gruber,* 91 Ill. App. 15, affirmed.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of St. Clair county; the Hon. WILLIAM HARTZELL, Judge, presiding.

CHARLES W. THOMAS, for appellant.

WEBB & WEBB, and HAMILL & BORDERS, for appellee.

Mr. CHIEF JUSTICE BOGGS delivered the opinion of the court:

The appellee recovered a judgment against the appellant company, in an action on the case in the circuit court of St. Clair county, in the sum of $6000. This is

an appeal from a judgment of the Appellate Court for the Fourth District affirming that of the circuit court.

The appellee had not arrived at legal age, and the suit was instituted by his father, William Gruber, as next friend. A bond to secure the costs was not filed, and the appellant moved the court to dismiss the cause because security for costs had not been given. A cross-motion for leave to prosecute as a poor person was interposed, supported by satisfactory proof that said plaintiff and his next friend, and each of them, were insolvent and unable to pay costs of suit, etc. The court allowed the cross-motion, and such ruling is assigned as for error. In *Chicago and Iowa Railroad Co.* v. *Lane*, 130 Ill. 116, the precise question was considered and determined adversely to the contention of appellant. It is insisted that the attention of the court was not called in that case to the ruling in the case of *Illinois Central Railroad Co.* v. *Latimer*, 128 Ill. 163, and it is urged the holdings in the two cases are in conflict. We think not. In the *Latimer case* the action was begun by a next friend without having previously, or at the time of beginning the suit, filed a bond for costs, and the motion entered by the defendant was to dismiss the suit on the ground that under the proper construction of the proviso to section 18 of chapter 64, entitled "Guardian and Ward," (Hurd's Stat. 1899, p. 943,) the filing of security for costs was a condition precedent to the right to institute the suit, and that the suit should be dismissed for failure to observe and perform this condition. A cross-motion for leave to file a bond for costs was interposed, and it was ruled the filing of a bond was not a "prerequisite jurisdictional necessity," but that the suit might be prosecuted by filing in court a bond at any period in the proceedings, when ordered to do so by the court, and the cross-motion was allowed. There is nothing said in the *Latimer case* inconsistent with the view expressed in the *Lane case*. In the *Latimer case* the infant was able to give security and not

insolvent, while in the *Lane case*, as in the case at bar, the infant plaintiff was insolvent and unable to give security for costs. In the *Lane case* we held that the said proviso to said section 18 of said chapter 64, and section 5 of chapter 33, entitled "Costs," (Hurd's Stat. 1899, p. 483,) were to be regarded as *in pari materia* and construed together, and that infant plaintiffs, as well as adult plaintiffs, were entitled to avail themselves of the privilege of prosecuting actions *in forma pauperis*.

It is next complained that the court refused to instruct the jury, at the close of the testimony in the cause, to find the appellant company not guilty. This raises a question of law whether the evidence tended to show a cause of action under either of the counts of the declaration. Trial was had upon the fourth amended declaration, which contained two counts. Each of the counts charged that the appellee, while engaged as a "shoveler" in one of appellant's mines, was seriously injured by a large quantity of coal which fell upon him. The first count charged that the injury was occasioned by the negligence of one William Hamilton, the "bottom man" or assistant mine manager for the appellant company. The second count charged that the appellant company negligently failed and omitted to exercise reasonable care to keep and provide reasonably safe the place where appellee, as its employee, was directed to work, and that by reason thereof the appellee received the injury complained of; that appellee did not have knowledge of the dangerous condition of the place, and that the appellant company, by its agents, had such knowledge and failed to warn the appellee.

As to the first count the contention of counsel for the appellant is, it appeared as a matter of law, from undisputed facts appearing in evidence, that the relation of fellow-servant existed between appellee and said Hamilton. Counsel for appellant concedes that in this court it must be assumed that said Hamilton was assistant mine

manager, and while discharging the duties of that position the relation of fellow-servant did not exist between him and the appellee, but contends that at the moment of time of the commission by Hamilton of the alleged acts of negligence whereby it is claimed the appellee received the injury in question, the said Hamilton was engaged in discharging the duties of another servant of the appellant company who was, beyond dispute, a fellow-servant of the appellee.

In appellant's mine, at the time in question, a machine moved by compressed air was employed in "undercutting" the vein of coal. Two men were required to operate the machine,—one to run the machine and the other to shovel away the *debris.* The same two men were expected to, and did, operate the machine during the day and two others during the night time. The appellee and one William Nagle were engaged in operating the machine during the daytime, Nagle having charge of the machine and appellee performing the duties of shoveler. On the morning of July 25, 1899, appellee and his companion, Nagle, who were the day men for operating the machine, went into the room and began to cut where the night men had left off. The machine had been out of order during the night and again got out of order, and Nagle requested appellee to go to another place in the mine for a key to fix it with, and in doing so appellee came upon William Hamilton, the "bottom man" or assistant mine manager. Hamilton followed appellee into the room and asked Nagle what was the matter with the machine, and being told, took charge of the machine and began to run it himself, and, as the evidence tends to show, in doing so commenced to cut to the left, cutting away a certain block of coal which had been left as a support, on which loose and cracked coal rested, and directed appellee to shovel. A few minutes after the machine began to be thus operated by Hamilton and appellee, a large quantity of coal from the loose and cracked place to the left of where the

machine was, fell upon appellee and most seriously and permanently injured him.

The evidence tended to show Hamilton knew the column of coal was necessary to support the body of coal above it, and further to show it was an act of negligence on his part to direct the machine against the supporting column of coal and cut it out from under the coal in the vein above the column, and that the injury to appellee resulted from such act of negligence. Hamilton assumed charge of the machine and undertook to operate it; but the evidence tended to show it was a part of his duties, as assistant mine manager, to repair the machine, and that he was not operating the machine for the purpose of mining coal, but with the view of ascertaining why the machine would not work and to enable him to remedy the defect in the machinery. If the action was taken by him in the discharge of his duties as vice-principal, his position was one of superiority, and not that of a fellow-laborer. The fact that in the discharge of his duties as assistant mine manager he engaged temporarily in work usually performed by Nagle would not justify the declaration, as matter of law, that he became a fellow-servant of appellee. *Pittsburg Bridge Co.* v. *Walker,* 170 Ill. 550; *Metropolitan West Side Elevated Railroad Co.* v. *Skola,* 183 id. 454.

The grounds of appellant's motion to instruct the jury to find the appellant not guilty as to the second count may be best stated by the following extract from the brief of counsel: "The law with reference to a safe place has no application to cases in which the work of the servant in the performance of his duties is the cause of the danger. Where the ordinary work of the servant changes the character of the working place, there would be no reason in a rule requiring the master to see that the place, which changes as the work progresses, is kept safe. In order that coal may be mined it must be undercut and blasted and made loose and liable to fall, and there can be no such thing as negligence of the master

in producing a condition which is necessary to the prosecution of the work of mining and one of its inevitable concomitants. It would be ridiculous to say that a coal operator engaged in mining coal must see to it that the coal which it is the duty of his servants to blast and pull down must be kept in a condition in which it is not liable to fall. It is their duty to put the coal in that very condition, and to make it not only liable to fall, but to cause it to fall."

Whether the position of counsel may or may not be proper where undercutting the coal in a mine is accomplished by the labor of miners without the aid of a machine, it is clear to our minds that under the evidence in this case a question of fact fairly arose under the second count of the declaration whether the appellant company had omitted its duty to use reasonable care to provide a safe place for the workmen operating a machine to perform that labor. The "undercutting" in this mine was performed by a machine operated by two men, one of whom managed the machine and the other shoveled away the *debris*. The same two men always operated the same machine during the day, and when there was night work, two other men operated it during the night. The machine was propelled by compressed air. The undercutting was always begun at the left side of the room and proceeded to the right. The machine, while at work, rested on a board, and about five feet could be undercut without moving the board. Each setting of the board was called a "board run." The coal was usually undercut to the depth of about four and a half feet. When the coal had been undercut in this manner, the machine men would leave the room and be followed up by "shooters," who would blast the coal down, and they in turn by "loaders," who would load the coal and clean up the room, after which the machine men would return to the room and again undercut. The last shooting and cleaning up in this room prior to the injury of appellee had

been done on the 21st or 22d of July. This left the fall of the coal at a certain point loose and cracked. The cracks extended five or six feet along the face of the coal and ran down nearly to the bottom. The mine manager had knowledge of this condition on the 23d. On the night of the 24th, when the two men were going into the room to run the machine, the manager warned them of the dangerous condition of the face of the coal. They went in and began to undercut, and cut two "board runs" and began the third, which extended under the loose and cracked coal. This they cut to a depth of about eighteen inches or two feet, left the remainder, of the usual depth, uncut, for support, and moved the machine to the right for another run and began to cut that, when the machine got out of order and the men quit for the night. On the morning of July 25, appellee and his associate, Nagle, who were the day men for operating the machine, went into this room and began where the night men had left off. The mine manager did not warn them of the dangerous condition of the face of the coal, but they were left to operate the machine in a place known to the appellant company not to be reasonably safe, or at least the evidence so far tended to show that such was the case as to warrant the submission of the question to the jury under the averments of the second count.

Whether the fall of coal in a mine is one of the usual and ordinary hazards of mining is a question of fact. Appellant contends that it became in this case a matter of law, for the reason the appellant company had adopted and posted in its mine a rule that the "danger of injury from falling coal is one of the usual risks of the service, and that its employees must govern themselves accordingly." In *Consolidated Coal Co.* v. *Scheiber*, 167 Ill. 539, we held such rules were mere evidentiary facts, and could not be availed of in this court to reverse a judgment of affirmance in the Appellate Court. The rule could not,

in any event, have application where the fall of the coal was occasioned, as we are here to assume it was, by the negligent act of the employer or one who bore the relation of vice-principal to the injured miner.

We think proper foundation had been laid for the impeaching questions propounded to the witnesses Doak and Coulter.

On cross-examination of the appellee, counsel for the appellant company read a portion of the first amended declaration and asked the appellee whether the statement therein made was true. The court sustained an objection to the question. The declaration from which counsel read had been withdrawn and the hearing was upon an amended declaration subsequently filed. Counsel for appellant did not offer to produce in evidence the former declaration from which he had read, and the question arising on the record is whether the court erred in refusing to require appellee to state whether the allegation read to him was true. The appellee had, in reply to oral interrogatories previously propounded by counsel for the appellant company, stated facts directly at variance with these allegations of the declaration. The answer which was excluded, had it been of the most favorable character possible to the appellant, would have been but a repetition of what the witness had already stated, and its exclusion could not have prejudiced the cause of appellant. Whether the allegations of the former declaration were admissible in evidence is not raised on this record.

The judgment of the Appellate Court must be and is affirmed.                               *Judgment affirmed.*